**DUNNE et al. v. UNITED STATES.**

No. 12195.

Circuit Court of Appeals, Eighth Circuit.

Sept. 20, 1943.

Albert Goldman, of Chicago, Ill., and Osmond K. Fraenkel, of New York City (James Lipsig, of New York City, M. J. Myer, of Chicago, Ill., and Gilbert E. Carlson and Dabe J. Shama, both of Minneapolis, Minn., on the brief), for appellants.

Victor E. Anderson, U. S. Atty., of St. Paul, Minn., and Henry A. Schweinhaut, Sp. Asst. to Atty. Gen. (Wendell Berge, Asst. Atty. Gen., Oscar A. Provost, John Ford Baecher, and Philip R. Monahan, Attys., Department of Justice, all of Washington, D. C., on the brief), for appellee.

Before STONE, JOHNSEN, and RIDDICK, Circuit Judges.

STONE, Circuit Judge.

Twenty-nine persons were indicted in two counts. One died before trial. By direction of the Court, five were found not guilty. The jury found five more not guilty. The jury found the remaining eighteen not guilty on the first count and guilty on the second count. Judgment was entered on the verdicts and sentences imposed. The convicted persons appealed separately. The appeals were consolidated in this Court and presented on a single record.

Count 2 of the indictment charged conspiracy (under 18 U.S.C.A. § 11, Act of June 28, 1940, § 3) to violate sections 9 and 10 of 18 U.S.C.A. (Act of June 28, 1940, §§ 1 and 2) in the respects therein set forth.

The issues here have to do with (I) the validity of the Act, (II) the sufficiency of the indictment, and (III) the sufficiency of the evidence.

### I. Validity of the Act.

The invalidity of the Act is urged upon two bases: (A) its inherent invalidity and (B) its invalidity as applied to the fact situation here.

(A) *Inherent Invalidity.* This attack is made upon each of the three here involved sections 9, 10 and 11. These sections, hereinafter set forth, have to do with the overthrow of the Government by force, the advocacy of insubordination, etc., in the armed forces, and conspiracies to effect either such overthrow or such insubordination.

140

■ We agree with appellants that, in approaching the problem of validity of a statute, which appears on its face to limit exercise of a right specifically protected by the Constitution, a presumption of validity is narrowed in its scope. Schneider v. State, 308 U.S. 147, 161, 60 S.Ct. 146, 84 L.Ed. 155; United States v. Carolene Products Co., 304 U.S. 144, 152, 58 S.Ct. 778, 82 L.Ed. 1234. In truth, "courts should be astute to examine the effect of the challenged legislation" where it affects the exercise of those fundamental individual rights expressly protected by the Constitution. Schneider v. State, 308 U.S. 147, 161, 60 S.Ct. 146, 84 L.Ed. 155. Here the challenge is that this Act abridges the freedom of speech specifically protected by the First Amendment. Therefore, we approach the problem with the attitude just stated.

■■ Appellants state that "This statute must seek its validating force in the vague and undefined 'right of self-preservation'." No such extremity exists. The statute is grounded upon specific Constitutional grants of power. The Preamble, setting forth the purposes of the Constitution, includes to "insure domestic Tranquility" and to "provide for the common defence", as well as to "secure the Blessings of Liberty." Article I, § 8, cl. 1 specifically grants to Congress the power to "provide for the common Defence." Clauses 12 to 16 grant the specific powers "to raise and support Armies," "to provide and maintain a Navy," "to make Rules for the Government and Regulation of the land and naval Forces," and covering the Militia. Clause 18 grants the power "To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers." Article IV, § 4 is "The United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion" and, upon application, "against domestic Violence." Thus, the Constitution expresses clearly the thoughts that the life of the Nation and of the States and the liberties and welfare of their citizens are to be preserved and that they are to have the protection of armed forces raised and maintained by the United States with power in Congress to pass all necessary and proper laws to raise, maintain and govern such forces.

■ The serious penalties of the Act are suggested as bearing upon our consideration. If the extent of penalties has any bearing, it is purely as make-weight. If the Act is invalid, it must be because of other reasons. If it be valid, the penalties to be assessed for violation are solely matters of legislative selection so long as they do not transcend the Eighth Amendment.

In addition to the above examined contentions which appellants urge to the Act in general, they make various specific attacks upon sections 9, 10 and 11 separately. We next examine these attacks upon the separate sections.

*Section 9* [1] makes it a crime "to advise, counsel, urge, or in any manner cause insubordination, disloyalty, mutiny, or refusal of duty by any member of the military or naval forces" or "to distribute any written or printed matter" doing these things, "with intent to interfere with, impair, or influence the loyalty, morale, or discipline" of such forces.

■ As preliminary to an attack upon this section, appellants recognize the similarity of this section to a part of section 3 of the Espionage Act of June 15, 1917, 40 Stat. 219, 50 U.S.C.A. § 33, which has been upheld (Schenck v. United States, 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470; Frohwerk v. United States, 249 U.S. 204, 39 S.Ct. 249, 63 L.Ed. 561; Debs v. United States, 249 U.S. 211, 39 S.Ct. 252, 63 L.Ed. 566), and, therefore, the necessity of avoiding here the effect of those decisions upon that Act. They rightly urge that this portion of the Espionage Act, by its express terms, was limited to periods when this country might be at war; and that the

---

[1] We are not here concerned with subsection "(b)" of section 9 which merely defines "military or naval forces" as used in subsection "(a)". The part of section 9 here attacked is as follows:

"§ 9. Subversive activities; undermining loyalty, discipline, or morale of armed forces

"(a) It shall be unlawful for any person, with intent to interfere with, impair, or influence the loyalty, morale, or discipline of the military or naval forces of the United States—

"(1) to advise, counsel, urge, or in any manner cause insubordination, disloyalty, mutiny, or refusal of duty by any member of the military or naval forces of the United States; or

"(2) to distribute any written or printed matter which advises, counsels, or urges insubordination, disloyalty, mutiny, or refusal of duty by any member of the military or naval forces of the United States."

above decisions must be construed, as ruling authority, with that situation in mind. Also, they rightly contend that this section 9 is, by its terms, also applicable to a state of peace. Therefore, they urge that such decisions are not here applicable and that whether section 9 is valid or not is not ruled by these authorities. We agree that these three cases do not rule this case as direct decisive authorities. The situation here that section 9 applies to a peace status as well as to war and that the conspiracy claimed here was during time of peace sufficiently differentiates those cases to prevent them from ruling these appeals. The question of validity of section 9 is, in that respect, open. On the other hand, it does not follow that those cases contain no expressions which are useful guides for determining the character of questions present here simply because the situation dealt with in those cases was different from that here present. In this connection, a pertinent matter should be stated. Although there had long been a seditious conspiracy Act, 18 U.S.C.A. § 6, there was a situation in 1940 which impressed Congress with the need for this Act. That situation, known to all, was the existence of war in Europe; the apprehension that this country might be drawn into war; the knowledge of the effective use of "fifth column" activities by countries which might be our enemies; and the apprehension that such activities were being or might be used in this country. In stating the purposes of the Bill, it was said in the House: "The officers testified before our committee that they were loath to ask for this provision in peacetime but that conditions had become worse, that propagandists were now gaining a foothold to some extent among the enlisted men of our Army and Navy, and that but for the high character and splendid loyalty that has always obtained among the rank and file of our men they would have had to ask for the enactment of this bill much sooner. So, then, title I interdicts the exertion of subversive influences with the intent to undermine the loyalty, morale, or discipline of our fighting men."

Thus, while this Act is applicable to peace as well as war conditions, it was enacted on the brink of war and to correct existing dangers.

■ The vital necessity of armed forces to maintain the National and the State governments and the liberties of the citizens is expressly recognized and provided for in the Constitution. The lack of such in the Confederation was one of the cardinal reasons for calling the meeting which became the Constitutional Convention. Congressional enactments having the purposes of raising or maintaining armed forces have high standing because of their importance. At the same time, they must not limit the constitutionally protected individual liberties of the citizen to any greater extent than is reasonably necessary and proper to accomplish the important allowable ends of preserving the life of the Government and the States and their orderly conduct. An armed force which lacks loyalty, morale or discipline or wherein is insubordination, disloyalty, mutiny or refusals to do their duty is far worse than no armed force at all and is positively an active menace to constituted government and to the liberties of the people. Therefore, the question here is whether this section of this Act goes so far beyond what is necessary or proper to effectuate its obviously necessary and proper purposes as to infringe upon protected individual rights.

The argument against validity of this section is as follows. That the threat to free speech arises from the provisions as to (1) what may not be said or written, (2) as to whom it may not be said or written, and (3) as to the extent to which the motives behind the statement or writing affect the verdict. (1) As to what may not be expressed, the argument centers around the statutory expression "or *in any manner cause* insubordination" (italics added), etc. It is urged that this expression is so broad that it includes "virtually the entire range of civilian expression" since it covers "any utterances whose effect upon any member of the armed forces may be to sow doubts in his mind concerning his duty" even if the forces were *not mentioned therein; that such expressions* could consist merely of "opinion concerning our defense policy, the conduct of the defense program, the nature of our allies, or any other important political or economic problem"; that such expression need not urge or suggest refusal of duty but be such merely as to cause him to wonder or doubt the accuracy of statements by his superior officers or the wisdom of governmental policies. (2) As to whom such expressions may not be made, the argument is that the provision includes utterances to civilians, if they "later reach, or conceivably might reach, or influence, actual members of the armed forces"; that there

is no requirement that the utterances be made "directly" to members of the forces. (3) As to the extent to which motives affect the verdict, the argument is that "a wicked intent can always be inferred from the nature of the words, if the jury considers those to be objectionable."

■ The fatal weakness in the above arguments arises from the situation that they do not examine the section as a unit but seek to dissect it and destroy it piecemeal. This method avoids or slurs over the governing consideration which runs throughout. That is the intent with which the expressions are made. Intent is the cardinal characteristic and vehicle which is necessary to carry any and all interdicted expressions across the boundary line into crime. This is merely an instance of usual criminal law which protects society from evildoers when they do acts—otherwise innocent—with intent to harm. Thus a man may even kill another and he may be entirely unblamed or he may be executed, dependent solely upon the intent motivating the act.

■ Another consideration is that words used must be capable of bringing about the forbidden result, since one cannot be found guilty "for advocacy of any of his opinions unless the words used had as their natural tendency and reasonably probable effect to obstruct the recruiting service, etc. [here create insubordination, etc.], and unless the defendant had the specific intent to do so in his mind". Debs v. United States, 249 U.S. 211, 216, 39 S.Ct. 252, 254, 63 L.Ed. 566; Schenck v. United States, 249 U.S. 47, 52, 39 S.Ct. 247, 63 L.Ed. 470.

While what has been stated in the two paragraphs preceding has to do with the protection thrown around persons accused of any crime, it is apposite to the issue and has a very direct application to the question of validity here. Neither by terms nor fair intendment does this section limit expressions of opinion or of criticisms of the Government or of its policies (civil or military) or of any officials or officers (civil or military) or of their actions so long as such expressions are not made with intent to bring about the unlawful things and situations covered by the section and, in addition, so long as they do not have a natural tendency and a reasonable probability of effecting these forbidden results. Section 9 is not inherently invalid.

*Section 10* is as follows:

"§ 10. Same [Subversive activities]; advocating overthrow of government by force

"(a) It shall be unlawful for any person—

"(1) to knowingly or willfully advocate, abet, advise, or teach the duty, necessity, desirability, or propriety of overthrowing or destroying any government in the United States by force or violence, or by the assassination of any officer of any such government;

"(2) with the intent to cause the overthrow or destruction of any government in the United States, to print, publish, edit, issue, circulate, sell, distribute, or publicly display any written or printed matter advocating, advising, or teaching the duty, necessity, desirability, or propriety of overthrowing or destroying any government in the United States by force or violence;

"(3) to organize or help to organize any society, group, or assembly of persons who teach, advocate, or encourage the overthrow or destruction of any government in the United States by force or violence; or to be or become a member of, or affiliate with, any such society, group, or assembly of persons, knowing the purposes thereof.

"(b) For the purposes of this section, the term 'government in the United States' means the Government of the United States, the government of any State, Territory, or possession of the United States, the government of the District of Columbia, or the government of any political subdivision of any of them."

■ Appellants attack the expression in subsection (a) (1)[2] "advocate, abet, advise, or teach the duty, necessity, desirability, or propriety" as being so vague and sweeping "that they bring within the forbidden area virtually any expression which is considered dangerous or subversive by prosecutor, court or jury." The words attacked are ordinary everyday terms with generally understood meanings. They are not vague. They are "sweeping" only in the sense that they endeavor to cover the different means by which Congress deemed the forbidden result might be brought about. The argument that the wording of the statute would be construed and applied as anything the prosecutor, court or jury considered dangerous or subversive has no force. If it

---

[2] Sub-section (a) (2) contains similar language.

implies that those officials would not act honestly, it is unique, unpleasant and unsound. If it means only that it is unsafe to the citizen to leave determination of such matters to those officials, then it is an argument against our system of administering justice rather than one of invalidity of this language. This objection is not well founded.

 Appellants call attention to the "Seditious conspiracy" Act, 18 U.S.C.A. § 6, and suggest that "no statute in addition * * * is needed." That is a legislative and not a judicial concern. As stated hereinbefore, there was a situation at the time this Act was before Congress which would well justify the enactment—if any justification be needed.

 Appellants urge that the section "makes no allowance for the circumstances under which an utterance is made." As shown earlier herein, that is a matter fully taken care of in the application of any criminal statute to the facts of each particular case.

 Appellants state: "When once we eliminate, as we must, the actual or attempted use of force as the evil to be prevented by this statute, there remains nothing upon which it can operate except prophecies, speculation, and analysis of future contingencies." The defect in this statement is that we are not privileged to "eliminate" from the section some of its most vital words.

Appellants attack subsection (a) (3) which makes it a crime "to organize or help to organize any society, group, or assembly of persons who teach, advocate, or encourage the overthrow or destruction of any government in the United States by force or violence; or to be or become a member of, or affiliate with, any such society, group, or assembly of persons, knowing the purposes thereof."

. One argument is that this "seeks to impose guilt by association." The language is incapable of that construction. The guilt is entirely individual and personal.

Another argument is stated thus: "the statute permits the predication of guilt upon the later judgment of court and jury as to the doctrines of a group. No member can know, until the verdict of guilt is passed upon him in a courtroom that his group holds views contrary to law. Thus, the statute affords no ascertainable standard of guilt. The assumption that it does, and that it is a simple matter to determine whether a party's doctrines advocate violence or revolution rests upon a misconception, deliberate or unconscious, of the nature of the doctrines and credos of the 'radical' groups against which the statute is ostensibly aimed."

 This argument is unsound. The sub-section applies to two classes of persons, to-wit, organizers and mere members. Organizers of a group certainly know, at the time, whether the organization they seek to create teaches, advocates or encourages the overthrow or destruction of any government in the United States by force or violence. As to mere members, the statute expressly requires that they be or become such "knowing the purposes thereof." What the court and jury do is ascertain whether the organization has such forbidden purposes and whether such requisite knowledge exists and these must appear beyond a reasonable doubt before conviction can be had.

 It is argued further that the "doctrines of radical parties are framed in a technical language which carry meaning only to the initiate," the assumption seemingly being that, therefore, it is difficult to determine therefrom whether overthrow of the Government by force is intended or not. In passing, one might wonder why obscure or doubtful or technical language is used. The English language does not lack for words to express clearly any thought which is intended to be widely understood, and party doctrines of importance are usually intended to be widely understood. However, language is sometimes purposely used to suggest or conceal meanings which, for some reason, the utterer does not care to bring entirely into the open. Appellants emphasize that this is a "radical" party and that opposition thereto would or might warp the judgments of triers of offenses in their construction of the meaning of language setting forth the party doctrines. For thirty-four years—long before the Communist Party in any form existed—there has been a statute making it criminal to conspire "to overthrow, put down, or to destroy by force the Government of the United States" 18 U.S.C.A., § 6. If a party or group—"radical" or otherwise—has no intention to overthrow or destroy the Government, nothing would be easier than to avoid doubtful language; and, considering existence of the above statute,

nothing would be more natural and advisable; and this would seem to be peculiarly so where the party or group regards itself as "radical" and thinks many—even officials and juries—would grasp opportunities to weaken or destroy it. When such a group with such apprehensions consciously uses cloudy words concerning a matter of such vital importance in their doctrines and to the safety of themselves individually and to existence of their group, they do not use them accidentally but for a very definite purpose. When they use words which may or may not mean the forbidden thing, they intend just one thing and that is to squirm through the statute leaving a haze which they hope will make it impossible or difficult to find any fracture by their passage. Courts should be careful in all things— particularly and equally where basic human liberties or where the life of the country is involved—but they do neither liberty nor their country a service by being so naive or simple as not to take into account human nature and existing situations known to every alert adult in the country. But however this may be, a trial puts the language before the judge and jury with every opportunity on each side to present their several constructions and to bring to bear thereon such side lights of facts as may help to bring out the meaning. The sinister significance must appear beyond reasonable doubt. The difficulty of determining a fact is no argument against the validity of a statute.

 Another argument is that many members of groups "are without true comprehension of the actual program or doctrine" thereof. Generally speaking, this is certainly true—even where group or party tenets are couched in non-technical terms and intended to be and easily understood. The protection here is that the statute does not cover such members unless they have knowledge of the unlawful purpose of the group. If they have that knowledge, they are adding their weight to the accomplishment of such unlawful purposes, whether those purposes are approved by them or not and whether any of such purposes were or were not the incentive for their becoming or remaining members. Appellants say that requirement of such guilty knowledge is of "little value" but their supporting argument is only repetition of their argument that prosecutors, judges and juries will not do their duty in judging the facts.

 Finally, it is argued that every member of a group or party is penally responsible for the conduct of every other member and "for every phrase in the statements and documents which are adjudged to reflect party views." If by this is meant the responsibility of a co-conspirator *under a conspiracy charge* for what is said or done to effectuate the conspiracy, the statement is true. If, as seems likely, it is meant that such acts and expressions of others could be used to prove the unlawful purpose of the group, then the statement is too broad. Such responsibility is not indefinitely sweeping. It attaches only to authoritative statements of which the member has knowledge; and it depends upon what he does or does not do or say, as manifesting his approval or disapproval, after he has such knowledge.

Section 10 is not inherently invalid.

*Section 11* is as follows:

"§ 11. Same: attempting or conspiring to commit prohibited acts

"It shall be unlawful for any person to attempt to commit, or to conspire to commit, any of the acts prohibited by the provisions of sections 9–13 of this title."

The attacks upon this section are (1) it extends into illimitable fields "to punish evil thinking" and not even speech or writing but "simply an agreement to speak or write"; and (2) that the legal machinery to determine violation will lead to misconstruction through the "influences of background, temperament, prejudice, emotional pressure and fear of public criticism." These are ill-founded. The section merely makes criminal all attempts or conspiracies to commit the acts declared criminal by sections 9 and 10 and extends those sections not at all. The "legal machinery" is simply that which works out justice in all criminal cases—the prosecutor, grand jury, judge and jury. Section 11 is not inherently invalid.

 (B) *Invalidity as Applied.* The attack upon the validity of the Act which appellants base on the "application" of the Act is the contention that the "clear and present danger" doctrine of Schenck v. United States, 249 U.S. 47, 52, 39 S.Ct. 247, 249, 63 L.Ed. 470, controls a statute of this character and that the facts here fall outside of that doctrine. "Where regulations of the liberty of free discussion are concerned, there are special reasons for observing the rule that it is the stat-

ute, and not the accusation or the evidence under it, which prescribes the limits of permissible conduct and warns against transgression". Thornhill v. State of Alabama, 310 U.S. 88, 98, 60 S.Ct. 736, 742, 84 L.Ed. 1093. Whether the Act is of a character to be measured by the above doctrine and, if so, whether it meets such measurement are pertinent to the issue of validity.

While the doctrine of the Schenck case "has afforded practical guidance in a great variety of cases in which the scope of constitutional protections of freedom of expression was in issue" (Bridges v. State of California, 314 U.S. 252, 262, 62 S.Ct. 190, 193, 86 L.Ed. 192), yet it is by no means of universal application. Gitlow v. People of State of New York, 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138, definitely determines that the Schenck case doctrine is not applicable in situations where the legislative body has, by statute, determined that "utterances of a certain kind involve such danger of substantive evil that they may be punished". 268 U.S. at page 670, 45 S.Ct. at page 631, 69 L.Ed. 1138. The distinction between such cases and those to which the Schenck case doctrine is applicable is clearly stated in the Gitlow opinion at pages 670 and 671 of 268 U.S., 45 S.Ct. at page 631, 69 L.Ed. 1138. This distinction has not been departed from nor weakened by any subsequent holding of the Supreme Court but, to the contrary, has been recognized and applied. Cantwell v. State of Connecticut, 310 U.S. 296, 307, 308, 60 S.Ct. 900, 84 L.Ed. 1213, 128 A.L.R. 1352; Herndon v. Lowry, 301 U.S. 242, 256-258, 57 S.Ct. 732, 81 L.Ed. 1066; Stromberg v. People of State of California, 283 U.S. 359, 368, 369, 51 S.Ct. 532, 75 L.Ed. 1117, 73 A. L.R. 1484; Whitney v. People of State of California, 274 U.S. 357, 371, 372, 47 S.Ct. 641, 71 L.Ed. 1095.

 The problem here is whether this Act falls within the rule of the Schenck case or the rule of the Gitlow case. We think it is within the Gitlow case. That the Nation may protect the integrity of its armed forces and may prevent the overthrow of the Government by force and that it may, as a means to those ends, punish utterances which have a tendency to and are intended to produce the forbidden results is not open to question. Near v. State of Minnesota, 283 U.S. 697, 716, 51 S.Ct. 625, 75 L.Ed. 1357; Whitney v. People of State of California, 274

U.S. 357, 371, 47 S.Ct. 641, 71 L.Ed. 1095; Gitlow v. People of State of New York, 268 U.S. 652, 667, 45 S.Ct. 625, 69 L.Ed. 1138. This Act does nothing more. The language defining the offences is clear, understandable and definite.

 To avoid the effect of the Gitlow and following cases appellants argue that a stricter scrutiny of validity should be exercised in instances of a National statute under the First Amendment than in those of a State statute under the Fourteenth Amendment. There is no foundation for such contention. It is the First Amendment which protects freedom of utterance. The effect of the Gitlow and subsequent cases was simply to "recognize in the Fourteenth Amendment the application to the states of the same standards of freedom of expression as, under the First Amendment, are applicable to the federal government". Bridges v. State of California, 314 U.S. 252, 268, 62 S.Ct. 190, 196, 86 L. Ed. 192.

Our conclusion is that sections 9, 10 and 11 of this Act are valid.

## II. Sufficiency of Indictment.

Appellants contend that the indictment (Count 2) is insufficient "because it merely repeats the words of the statute, fails to allege facts showing the commission of a crime, and is vague and uncertain" and because it "does not allege a conspiracy."

 Count 2 follows the wording of the statute closely in stating the *broad* purposes of the conspiracy. Whether a crime is sufficiently charged where the statutory wording is followed depends upon the particularity of the statutory wording. If the statutory language is, "according to the natural import of the words, fully descriptive of the offense, then ordinarily it is sufficient". Potter v. United States, 155 U.S. 438, 444, 15 S.Ct. 144, 146, 39 L.Ed. 214; also see Armour Packing Co. v. United States, 209 U.S. 56, 84, 28 S.Ct. 428, 52 L.Ed. 681; Ledbetter v. United States, 170 U.S. 606, 610-612, 18 S.Ct. 774, 42 L.Ed. 1162; Hodgson v. State of Vermont, 168 U.S. 262, 269, 18 S.Ct. 80, 42 L.Ed. 461; Taran v. United States, 8 Cir., 88 F.2d 54, 56. The statutory definition here is definitely descriptive. However, this count of the indictment did not stop with stating the broad purposes of the conspiracy. It particularized that the conspirators "would * * attempt to carry out and accomplish said conspiracy in the manner set out at

numbered paragraphs One to Thirteen, inclusive, in the first count of this indictment."[3] Thus, the indictment clearly stated the conspiracy was to do the things forbidden by the statute in the particular manners set forth. This count of the indictment is not insufficient as fully informing accused of just what the conspiracy was

[3] These thirteen paragraphs are as follows:

"1) The defendants, who were officers, leaders, active members, and in control of a certain political party or organization known as the Socialist Workers Party, which said party or organization was composed of a large number of persons, the exact number being to the Grand Jurors unknown, would procure, induce, influence, incite, and encourage the members of the Socialist Workers Party, and divers other persons, whose names are to the Grand Jurors unknown, to join with them to bring about the overthrow by force of the Government of the United States, and the destruction thereof by force, and the opposition by force to the authority thereof.

2) The defendants would seek to bring about, whenever the time seemed to them propitious, an armed revolution against the Government of the United States, and the authority thereof.

3) Said armed revolution would be brought about and joined in by the workers and laborers and farmers of the United States, or as many of them as said defendants and their co-conspirators could procure and induce to engage therein.

4) Said workers, laborers and farmers would be by the defendants and their co-conspirators urged, counseled, and persuaded that the Government of the United States was imperialistic, capitalistic and organized and constituted for the purpose of subjecting workers and laborers to various and sundry deprivations and for the purpose of denying to them an alleged right to own, control and manage all property and industry in the United States, all to the end that said workers and laborers would be willing to take part in the armed revolution envisaged and projected by said defendants.

5) Members of Socialist Workers Party would be placed in key positions in all major industries, among others the transportation, mining, lumbering, farming, shipping, and manufacturing industries, so that said party members could and would induce, persuade, and procure the workers and laborers in said industries to join said party, embrace its principles and objectives and obey the commands of its leaders, thereby enabling the defendants and other leaders of said Socialist Workers Party to obtain and exercise absolute control of all industries in the United States to the end that by paralyzing the same, said projected armed revolution could be more easily and successfully accomplished.

6) Members of the Socialist Workers Party would be placed in key positions in all trade unions and said party members would especially endeavor to obtain absolute control over such trade unions, so that the members thereof, comprising a vast number of workers and laborers in the United States, would be subject to the will and commands of said party leaders, thus enabling the defendants and their co-conspirators to bring about a complete stoppage of work in the major industries of the United States at any given time, and preventing thereby the duly constituted government of the United States from adequately defending itself against the armed revolution the defendants conspired to bring about.

7) The defendants and their co-conspirators would endeavor by any means at their disposal to procure members of the military and naval forces of the United States to become undisciplined, to complain about food, living conditions, and missions to which they would be assigned, to create dissention, dissatisfaction and insubordination among the armed forces, to impair the loyalty and morale thereof, and finally to seek to gain control of said naval and military forces so that the enlisted personnel thereof would revolt against its officers, thereby enabling said defendants to overcome and put down by force and arms the constitutional government of the United States.

8) When the Selective Service Act was passed, 50 U.S.C.A. Appendix § 301 et seq., the members of said Socialist Workers Party would be urged to willingly accept service, but after being inducted into the army of the United States, to do everything in their power to disrupt, hinder and impair the efficient functioning thereof, and when the appropriate time came to turn their weapons against their officers.

9) The defendants and their co-conspirators would, and they did, advocate and attempt to bring about control of the Militia by the workers and laborers of the United States, especially by trade unions; and the defendants would advise, counsel, and encourage the said workers and laborers to arm themselves and to become proficient and trained in the use thereof so that they would be better equipped to overthrow, destroy, and put down by force the Government of the United States.

10) Workers and laborers would be, and

designed to accomplish and just how it was planned to accomplish those designs.

█ As to the contention that no conspiracy was alleged, little need be said. The language of this count is clear as to such allegation. The argument that use of the word "would" instead of "to" to state the purposes of the conspiracy is defective is, to say the least, hypercritical.

This count of the indictment is sufficient.

### III. *Sufficiency of Evidence.*

Appellants urge insufficiency of the evidence in the four respects that it does not show: (a) that they conspired to advocate the overthrow of the Government by violence or to cause insubordination in the armed forces; (b), that they had knowledge of the nature of the conspiracy; (c) that the alleged conspiracy existed after enactment of this statute; (d) that certain of the appellants were parties to the alleged conspiracy after enactment of this statute.

### (a) *Advocacy of Violence and of Insubordination.*

Under this point, appellants treat separately the advocacy of violence to overthrow the Government and the advising, etc., insubordination, disloyalty, mutiny or refusal of duty in the armed forces. This is a convenient method of presentation and will be followed in our examination and determination.

█ *Advocacy of Violence to Overthrow the Government.* We adopt, in part, appellants' definition as to "overthrow of the Government," which is that "The overthrow or destruction of a state consists essentially in abolishing its forms and institutions * *." Whether the remainder of the definition—"and substituting other institutions in their place"—is valid, we need not inquire since our interest here is only in the overthrow of the existing Government of the United States. That such a drastic, complete change in the present form of Government in the United States was advocated as would inevitably result in abolishing that present form is beyond dispute in this evidence. But the Act is not intended to prevent changes in our Government but to prevent such changes being brought about in a particular manner—by violence. The Constitution expressly recognizes that changes might be desired by the people in the form and substance of the government which it prescribed and it defined a clear, workable, orderly method for making any changes the

---

they were, organized into military units which would be armed and drilled and taught how skilfully to use pistols and rifles, which said units would be, and were, called 'Union Defense Guard'; said units would ostensibly be used for protection against violent attempts to destroy trade unions, but were in truth and in fact, designed and intended to be used ultimately to overthrow, destroy, and put down by force the duly constituted Constitutional Government of the United States.

11) The said defendants and their co-conspirators would, and they did, by and for the use of themselves and other persons to the Grand Jurors unknown, procure certain explosives, firearms, ammunition, weapons and military equipment, for the aforesaid purpose.

12) The said defendants and their co-conspirators would, and they did, accept as the ideal formula for the carrying out of their said objectives the Russian Revolution of 1917, whereby the then existing government of Russia was overthrown by force and violence, and the principles, teachings, counsel and advice of the leaders of that revolution, chiefly V. I. Lenin and Leon Trotsky, would be, and they were, looked to, relied on, followed and held out to others as catechisms and textbooks directing the manner and means by which the aforesaid aim of the defendants could, and would be, accomplished; and accordingly, certain of the defendants would, and they did, go from the City of Minneapolis, State and District of Minnesota, and from other cities in the United States to Mexico City, Mexico, there to advise with and to receive the advice, counsel, guidance, and directions of the said Leon Trotsky.

13) The said defendants and their co-conspirators would, and they did, endeavor to procure and persuade as many other persons as possible to join with them in their undertaking by printing, publishing, selling, distributing and publicly displaying and by causing to be printed, published, sold, distributed, and publicly displayed, written and printed matter, including leaflets, pamphlets, newspapers, magazines and books which advocated, advised and taught the duty, necessity, desirability, and propriety of overthrowing and destroying by force and violence all governments in the world said by the defendants, their mentors and leaders, to be imperialistic and capitalistic, and of the governments so characterized, the Government of the United States of America was said to be the foremost."

people might ever deem necessary or desirable.[4] An individual or organization may advocate any changes whatsoever in the present government—no matter how drastic or how complete—so long as the changes are to be brought about in the orderly manner provided. It is only when the change is to be brought about by violence that the Act reaches out its restraining hand. Therefore, the question here is not the fact of change or the character of change advocated by appellants but whether they propose to accomplish those changes by violence.

The purposes and methods of appellants centered in their activities in connection with the Socialist Workers Party. Therefore, the purposes and particularly the methods of accomplishment of such purposes are most important. In 1937, various individuals were expelled from the Socialist Party because of their revolutionary— "left wing"—beliefs. These persons held a convention (December 31, 1937 to January 3, 1938) at which the Socialist Workers Party was organized. This convention issued a Declaration of Principles and adopted a Constitution. Thus a party organization was set up and party activities proceeded.

The Declaration of Principles is "an application of the Marxian theories and doctrines, his whole system of ideas, to the social problem in America" (R. 940). To understand whether that document itself advocated the use of force to overthrow the Government in order to accomplish its purposes, it is necessary to outline some of those purposes. The Declaration states that the present social situation in the United States is that of a "capitalistic" society; that such society is based on private ownership of property; that a small minority owns the vast amount of basic productive property; that this minority exploit the majority; that the "State" is simply an organization to protect and aid this minority in perpetuating themselves and in their exploitations; that this situation can be corrected only by a "social revolution"; that such revolution means a political and economic transformation fundamentally affecting the property system and methods of production; that such "revolution" will necessitate expropriation,

without compensation, of the property held by this minority and its operation by the proposed new "proletarian" government; that it is necessary to take complete political power; that, to accomplish these things, the exploited classes need leadership; and that the Party is formed to supply the leadership.

The Declaration sets forth the program of action to effectuate this overthrow of the existing capitalistic society and the Government which supports it. The first step is to build up the strength of the party so that it can have a majority of the exploited classes back of its leadership. The final step is to overthrow the existing Government by force. The statements now to be quoted from the Declaration leave no doubt that the final means are to be force and not orderly change. "The belief that in such a country as the United States we live in a free, democratic society in which fundamental economic change can be effected by persuasion, by education, by legal and purely parliamentary methods is an illusion" (R. 1182). "The fundamental instruments of the workers' struggle for power cannot be the existing institutions of the governmental apparatus, since these represent basically the interests only of the capitalistic minority" (R. 1183). "Whenever the revolutionists find themselves in a Labor Party, they will stand at each stage for those concrete policies and actions which sum up a progressive and class perspective; for complete breaks with the capitalist parties and no support of candidates on capitalist tickets; *for direct mass actions and avoidance of limitation to parliamentary activities;* for full internal democracy; for support and defense of concrete working class rights against their invasion from any source, including invasions from candidates of the Labor Party itself; etc." (R. 1199, italics added). "While relying primarily on mass actions, propaganda and agitation as the means for furthering its revolutionary aim, the Party will also participate in electoral campaigns, though *at all times contending against the fatal illusion that the masses can accomplish their emancipation through the ballot box*" (R. 1200, italics added).

That the final use of force to overthrow the Government was the method of the

---

[4] In fact, the Constitution was ratified with the clear knowledge that certain amendments would be immediately desirable and the First Congress submitted the first ten Amendments which were promptly ratified. Eleven other Amendments have been ratified during the subsequent years.

Party is further shown by expressions in the official publications of the Party, by its leaders, officers, organizers, speakers, lecturers and writers, and by the privately expressed statements of such.[5] The Party opposed Stalin (R. 932-4, 1196, 1266, 1272), supported Trotsky and adopted and supported the Trotsky program from the beginning of the Party (R. 944-5). After Trotsky arrived in Mexico (January, 1937) various leaders of the Party conferred with him there as to policies and actions. In the Spring of 1938 and thereafter, the matter of the use of Defense Guards was discussed with him (R. 288, 946-7). He either originated or endorsed the idea of such bodies (R. 286-7, 546, 569, 606, 686, 742-3, 949-50). The Guards were to be organizations which Party members would foster within labor unions to use force in protection of the unions. They were to grow into a militia and finally into the Red Army (R. 286-9, 415, 491, 546, 606, 716, 968-9, 1085-6). Such a Defense Guard was organized in the Teamsters' Local No. 544 at Minneapolis in July or August, 1938 (R. 1044) or in the Fall of 1938 (R. 1014, 1102). This record leaves no doubt that force was the ultimate means to be used by the Party in the overthrow of the Government by the "proletariat". Also, the record is substantial that a plan of organizing this force through the development of Defense Guards was employed.

*Insubordination in the Armed Forces.* The record here contains substantial evidence of the purpose to create insubordination in the armed forces by propaganda therein. Some of the evidence to this effect is found at the pages of the record following: 265, 277-8, 280, 343, 344, 361, 458, 494, 515, 523, 548, 565, 589, 616, 621, 685, 688, 708, 709, 712-13, 741, 742, 802, 806, 817, 915-22, 974-5, 981-1003, 1063, 1084, 1085-6, 1112, 1126, 1127, 1128.

*(b) Knowledge of Defendants as to Nature of Conspiracy.*

Under this point, appellants argue the insufficiency of the evidence to show that the defendants had knowledge that the conspiracy involved advocacy of overthrowing the Government by force and of causing insubordination in the armed forces. We are not dealing here with persons who were simply members of the Party and nothing more. Every one of them was a prominent active worker in the organization and in propaganda work.[6] Several of them participated in the organization of

---

[5] An incomplete list of references to such evidence in this record is as follows: R. 257-8, 265, 266, 273, 280, 282, 286-9, 291, 345, 352, 353, 377, 403, 404, 411, 412, 413, 436, 439-448, 472, 476, 477, 483, 484, 488, 491, 492, 493, 509, 510, 516, 523, 525, 540, 543, 544, 548, 576-7, 580-1, 589, 591, 595, 606, 614, 616-21, 676, 684, 688, 707, 716, 720, 721, 722, 725-6, 727, 728, 731, 732, 734, 735, 742, 743, 744, 746, 759, 760, 763, 764, 793-4, 795-6, 797, 799-800, 802-3, 804, 805, 806, 809, 812, 814, 815, 816, 817, 818-21, 822, 882-886, 887, 888, 892, 895-6, 912, 938, 968-1003, 1057, 1070, 1078, 1080, 1082-6, 1091, 1094, 1095, 1112-13, 1182, 1199, 1200, 1247-50, 1255, 1258, 1259.

[6] Cannon was one of those expelled from the Socialist Party in 1937; a member of the Convention which created the Socialist Workers Party; was a member of the Convention committee which drafted the Declaration of Principles; and was Secretary of the National organization of the Party. Carlson was one of those expelled; was State organizer for Minnesota, devoting her entire time to that work; was the candidate of the Party for United States Senator; and was a frequent speaker for the Party. Coover was Financial Secretary of the Minneapolis "Branch" of the Party; was a member of the Executive Committee of that Branch; and a full-time organizer for the Branch. Cooper was a member of such Executive Committee and had presided at several meetings of the Branch. DeBoer was a member of the National Committee of the Party; was regarded as the "head" of the National organization; and had presided at several Branch meetings. Dobbs was National Labor Secretary of the Party; was a member of the Executive Committee of this Branch; was author of Party pamphlets and speaker for the Party. Dunne was one of the expelled; was a member of the Convention creating the Party; was a member of the National Committee of the Party; was a State organizer; was an organizer of the Defense Guards; and was a lecturer, writer and speaker for the Party. Geldman was a member of such Convention; was a member of the Executive Committee of this Branch; had presided at Branch meetings; and was a lecturer and speaker for the Party. Goldman was a member of the Executive Committee of the Branch; and was one of the principal Party writers, lecturers and speakers. Hamel was a collector of Party dues. Hansen was a member of the Executive Committee of this Branch; was a leader in organizing the Defense Guards; was a collector of Party dues; and was a writer of

the Party and all of them were or became members during the year (1938) the Party was founded. Each of them was active in spreading the Party propaganda and in increasing membership—in fact, the major activities of the Party were devoted to building up, mainly by propaganda, the membership of the Party to the strength where the social revolution could be successfully launched. Considering the long association with and the prominent positions and activities of the defendants in the Party and the important place in the Party program of use of force to overthrow the Government and of creation of insubordination, etc., in the armed forces, it would be idle to suppose that each of them did not have full knowledge of these two vital elements of the Party program. In addition, there is direct proof of such knowledge as to each defendant, except Schoenfeld.[7] This direct evidence comes partly from testimony of the four defendants (Cannon, Carlson, Dobbs and Dunne) who were witnesses; partly from basic Party documents (such as the Communist Manifesto) which defendants urged as reading matter upon those they were soliciting for membership; partly from writings of Party literature by various defendants; partly from editorials and articles in official publications (such as the Socialist Appeal, The Militant, the Fourth International and pamphlets) put out by the Party, kept for sale at its headquarters in Minneapolis and urged upon members and prospects; and partly from oral statements by various defendants.

*(c) Existence of Conspiracy after Enactment of Act.* This point is that, assuming the Party advocated the forcible overthrow of the Government and advocacy of insubordination, etc., in the armed forces prior to the date (June 28, 1940) of enactment of this Act, yet there is no proof of continuance of this policy after this date. The argument is that the Declaration of Principles was withdrawn at a Convention held in December, 1940; that the only official publication (What is Trotskyism) published after June 28, 1940, which could be interpreted as advocating violence was not written by any defendant, was an expression of opinion by the author not binding on the Party, with no showing it was adopted by the Party and only three mimeographed copies found at Party headquarters; that there is no evidence that any of defendants were concerned with this publication or even knew its contents. The main stress of this argument is based on the effect of withdrawal of the Declaration of Principles.

It is true that a specially called convention of the Party adopted (December 21, 1940) a resolution reading as follows:

"The Declaration of Principles of the Socialist Workers Party—adopted by the Foundation Convention, (Dec. 1937 to Jan. 3, 1938)—requires some changes and additions to bring it up to date and correspond with new developments which have transpired since the Foundation Convention.

This task can be performed satisfactorily only after adequate time has been provided for consideration of proposed changes and their discussion in the ranks of the party. As a step towards the preparation of this task, the Fourth (Special) National Convention resolves:

1. To suspend and withdraw the Declaration of Principles adopted at the Foundation Convention;

---

Party pamphlets. Hudson was a member of the Executive Committee of the Branch; had presided at some of its meetings; was a Party writer and speaker. Kuehn was a member of the Executive Committee of the Branch. Morrow was Associate Editor of a Party paper; and was a Party pamphleteer and speaker. Schoenfeld was a member of the Executive Committee of the Branch. Skoglund was member of this Executive Committee; had presided at meetings of the Branch; and was a Party speaker. Palmquist and Russell were two of the most active propagandists and workers.

[7] An incomplete list of record references follows: Cannon R. 979–1002; Carlson, 361, 488, 523, 589, 822, 1057, 1061, 1094, 1112; Cooper, 492, 509, 511, 516; Coover, 257–8, 273, 276, 291–2, 349 (in connection with 352–3), 494, 509, 511; DeBoer, 289, 411, 412, 414–16; Dobbs, 273; Dunne, 257–8, 273–4, 276, 348 (in connection with 252–3), 1057–8, 1078, 1083, 1085, 1091; Geldman, 257–8, 272–3, 349 (in connection with 352–3), 433–4, 494, 509, 515; Goldman, 802–3, 1243, 1247–50, 1256–7, 1259; Hamel, 289, 412; Hansen, 272–3, 276, 287–9, 412, 579–82; Hudson, 257–8, 272–3, 276, 349 (in connection with 352–3), 688; Kuehn, 257–8, 276; Morrow, 342–4, 523, 711–13, 814–15; Palmquist, 494, 515, 517; Russell, 333–4, 341, 476, 477, 478, 483–5; Skoglund, 257–8, 272–3, 276, 290–1, 413–14, 465–6.

2. To authorized [authorize] and instruct the National Committee to prepare a draft of an amended Declaration of Principles for submission to the party for discussion and eventual decision by party convention or referendum."

A committee was appointed to make "a new draft of an amended declaration" (Cannon, R. 872). This draft was considered and accepted by a Party convention held October 10-12, 1941—two weeks before this trial began. The Convention submitted this accepted draft to the Party "for discussion and possible amendment." So far as this record shows, no final action has been taken on this draft by the Party. Under what "principles" has the Party been operating since that date? None at all? Have all of the "principles" of the Party been suspended and withdrawn?

That this "suspension and withdrawal" was not motivated by a desire and intention to comply with the Act is shown by the purposes in view in passing the resolution. The purposes of this "suspension and withdrawal" had nothing to do with the doctrine of the Party as to overthrow of the Government by force or as to advocacy of insubordination, etc., in the armed forces. The purposes are stated by defendant James P. Cannon, one of the principal leaders of the Party, to be as follows: "The principal reason, I may say, was the passage by Congress of a bill known as the Voorhis Act, which penalized parties belonging to international organizations. That was the principal reason. Subsidiary reasons were that we had in the meantime—the party in the meantime had changed its position on the question of the labor party and differently from the way it is stated in the Declaration. Some questions had become outdated by the passage of events, and in general we felt the necessity of a new draft." The main purpose had to do with a desire to escape registration under the Voorhis Act, 18 U.S.C.A. §§ 14–17 which was enacted October 17, 1940, and "subsidiary" purposes were to "bring it up to date and correspond with new developments which have transpired since the Foundation Convention." There was not the slightest hint of any contemplated change in the important program as to use of force. If such a change was contemplated or intended to be so understood by Party members, it was carefully and intentionally conceal-ed. Even as to the Voorhis Act, this action was merely a subterfuge and smoke screen. As to that Act, members were advised that the Party might have to go "underground" and they should destroy membership cards and be designated by numbers in order to conceal their identity.

This "suspension and withdrawal" was not intended to have and it did not have the slightest effect upon the Party doctrines and methods. No diminution of Party activity since "suspension and withdrawal" of the Declaration in December, 1940, is anywhere suggested in this record. The contrary is shown. About February 1, 1941—less than six weeks after adoption of the withdrawal resolution—the Party issued a bulletin entitled "A B C of Marxism." At that time, defendant Farrell Dobbs (National Labor Secretary of the Party) was in charge of publications. This bulletin states that the class struggle ends in revolution or in common ruin of the contending classes; that the trade unions unify the mass workers for "every day ends"; that the Party unifies the working class around a revolutionary program; that the revolutionary party must be an international party, organized with international leadership as well as nationally with national leaders; that the Russian Revolution of 1917-1918 was the greatest event in history; that "the Bolsheviks started out with a clear idea (at least in the minds of its greatest leaders, Lenin and Trotsky) that the ruling class would never give up power voluntarily, that it was necessary to overthrow that ruling class. But the rulers were entrenched behind the power of the state with its army and police force. Hence, it was necessary to crush completely the old state"; that Trotsky, "the greatest living exponent of Marxism" organized a new international to guide the workers to victory; and that such victory cannot be achieved without a "revolutionary leadership." Between March 1 and 10, 1941—about two and one-half months after this resolution—the Party put out a bulletin entitled "What is Trotskyism." At that time also, defendant Farrell Dobbs was still in charge of such publications. This bulletin advocated insubordination in the armed forces and stated "the whole object of the proletarian military policy is to mobilize and militarize the youth, the proletarian ones, so as to further the interests of the revolution."

The two above bulletins were not the only manifestations, after December, 1940, that the Party was still pursuing its advocacy of force. Articles appeared in the official publications (R. 796, 800, 822, 1125), two of these being by defendant Goldman. Also, the same literature (including the Declaration of Principles and the Communist Manifesto) continued to be sold at Party headquarters in Minneapolis where defendants Carlson and Coover were in charge. Also, when the search warrant was served at headquarters, on June 27, 1941, a large variety of communistic books, pamphlets and official Party publications were seized. As to many of these, the number of copies on hand showed clearly that they were not there merely for library purposes but were for sale or distribution. In fact, the FBI agent bought from Mrs. Carlson at headquarters, on June 27, 1941, a copy each of the Declaration of Principles and of the Communist Manifesto. This record shows convincingly that neither the enactment of this Act nor the "suspension and withdrawal" resolution had the slightest effect upon the doctrines, purposes or methods of the Party. There was no break, much less abandonment, of the conspiracy to use force to overthrow the Government and to advocate insubordination, etc., in the armed forces.

*(d) Parties to Conspiracy Following Enactment of Act.*

This point is that it was necessary to prove, as to every defendant, that each continued to be a party to the conspiracy after June 28, 1940 (date of enactment of this Act) and that proof of Party membership before that date is not sufficient. It is urged that the proof is deficient as to this. Whether the necessity of proof thus stated exists or not, we need not and do not examine or determine. However assuming it does exist, it was met by evidence of membership activity by each of the defendants subsequent to enactment of this Act.[8]

 Every word of this record of over thirteen hundred pages has been carefully read and considered. Consideration thereof has required the assembly from the record of the evidence as to each of eighteen defendants and as to four different matters as to each defendant. This has been done. This thorough examination of the record leaves no doubt as to the sufficiency of the evidence and as to the justice of the verdict.

The judgment as to each appellant is affirmed.[9]

---

[8] Record page references to some of such testimony follows: 293, 649-50, 685, 694-5, 699, 700, 710, 729, 741, 743, 754, 755-6, 758, 773, 784-5, 787, 793-6, 806.

[9] The preparation of this opinion has been held up as we were informed that the case of Schneiderman v. United States, 63 S.Ct. 1333, 87 L.Ed. —, pending in the Supreme Court, might bear upon some of the issues presented here. That case was determined by the Supreme Court on June 21, 1943. We have carefully examined that opinion and conclude that it is based upon a situation so different—legally and factually—from this case, that it has no application to the matters before us.