ROBERT THOMPSON, as Chairman of the Communist Party of the State of New York, et al., Plaintiffs, *v.* WILLIAM J. WALLIN et al., Constituting the Board of Regents of the University of the State of New York, Defendants. (Case No. 1.)

In the Matter of CHARLES L'HOMMEDIEU et al., Petitioners, against BOARD OF REGENTS OF THE UNIVERSITY OF THE STATE OF NEW YORK et al., Respondents. (Case No. 2.)

Supreme Court, Special Term, Albany and Ulster Counties, November 28, 1949.

*Unger Freedman & Fleischer* (*David M. Freedman, Bernard Jaffe* and *Abraham Unger* of counsel), for plaintiffs.

*Fred G. Moritt, Frederic A. Johnson* and *Morris Eisenstein* for petitioners.

*Nathaniel L. Goldstein, Attorney-General* (*Wendell P. Brown, Ruth Kessler Toch* and *Kent H. Brown* of counsel), for defendants and respondents.

*Pressman, Witt & Cammer* for Teachers Union, Local 555, *amicus curiæ.*

*Will Maslow* and *Shad Polier* for American Jewish Congress, *amicus curiæ.*

*Samuel M. Birnbaum* for American Legion, Department of New York, *amicus curiæ.*

*Ralph Shapiro* for International Fur and Leather Workers Union, *amicus curiæ.*

*Morris Zuckman* for American Labor Party, *amicus curiæ.*

*Michael B. Atkins, Howard N. Meyer* and *Herbert I. Silverman* for National Lawyers Guild, *amicus curiæ.*

*Arthur C. Buck,* as president of Association of Teachers of Social Studies, *amicus curiæ.*

SCHIRICK, J.   Chapter 416 of the Laws of 1917 (§ 3) introduced into our law a provision which now constitutes section 3021 of the Education Law.   It reads as follows: " A person employed as superintendent of schools, teacher or employee in the public schools, in any city or school district of the state, shall be removed from such position for the utterance of any treasonable or seditious word or words or the doing of any treasonable or seditious act or acts while holding such position."

Twenty-two years later the Legislature enacted chapter 547 of the Laws of 1939, which has become section 12-a of our Civil Service Law (as amd. by L. 1940, ch. 564).   This provision is as follows: " No person shall be appointed to any office or position in the service of the state or of any civil division or city thereof, nor shall any person presently employed in any such office or position be continued in such employment, nor shall any person be employed in the public service as superintendents, principals or teachers in a public school or academy or in a state normal school or college, or any other state educational institution who: (a) By word of mouth or writing wilfully and deliberately advocates, advises or teaches the doctrine that the government of the United States or of any state or of any political subdivision thereof should be overthrown or overturned by force, violence or any unlawful means; or (b) Prints, publishes, edits, issues or sells, any book, paper, document or written or printed matter in any form containing or advocating, advising or teaching the doctrine that the government of the United States or of any state or of any political subdivision thereof should be overthrown by force, violence or any unlawful means, and who advocates, advises, teaches, or embraces the duty, necessity or propriety of adopting the doctrine contained therein; (c) Organizes or helps to organize or becomes a member of any society or group of persons which teaches or advocates that the government of the United States or of any state or of any political subdivision thereof shall be overthrown by force or violence, or by any unlawful means; (d) A person dismissed or declared ineligible may within four months of such dismissal or declaration of ineligibility be entitled to petition for an order to show cause signed by a justice of the supreme court, why a hearing on such charges should not be had.   Until the final judgment on said

hearing is entered, the order to show cause shall stay the effect of any order of dismissal or ineligibility based on the provisions of this section. The hearing shall consist of the taking of testimony in open court with opportunity for cross-examination. The burden of sustaining the validity of the order of dismissal or ineligibility by a fair preponderance of the credible evidence shall be upon the person making such dismissal or order of ineligibility.''

With the foregoing provisions in mind, the Legislature at its last session enacted a further statute which has become known as the '' Feinberg Law ''. This is chapter 360 of the Laws of 1949, the material parts of which are hereby quoted:

'' Section 1. The legislature hereby finds and declares that there is common report that members of subversive groups and particularly of the communist party and certain of its affiliated organizations, have infiltrated into public employment in the public schools of the state. This has occurred and continues despite the existence of statutes designed to prevent the appointment to or the retention in employment in public office and particularly in the public schools of the state of members of any organization which teaches or advocates that the government of the United States or of any state or of any political subdivision thereof shall be overthrown by force or violence or by any unlawful means. The consequence of any such infiltration into the public schools is that subversive propaganda can be disseminated among children of tender years by those who teach them and to whom the children look for guidance, authority and leadership. The legislature finds that members of such groups frequently use their office or position to advocate and teach subversive doctrines. The legislature finds that members of such groups are frequently bound by oath, agreement, pledge or understanding to follow, advocate and teach a prescribed party line or group dogma or doctrine without regard to truth or free inquiry. The legislature finds that such dissemination of propaganda may be and frequently is sufficiently subtle to escape detection in the classroom. It is difficult, therefore, to measure the menace of such infiltration in the schools by conduct in the classroom. The legislature further finds and declares that in order to protect the children in our state from such subversive influence it is essential that the laws prohibiting persons who are members of subversive groups, such as the communist party and its affiliated organizations, from obtaining or retaining employment in the public schools, be rigorously enforced. The legislature deplores the failure heretofore to prevent such infiltration which threat-

ens dangerously to become a commonplace in our schools. To this end, the board of regents, which is charged primarily with the responsibility of supervising the public school systems in the state, should be admonished and directed to take affirmative action to meet this grave menace and to report thereon regularly to the state legislature.''

'' § 3. Article sixty-one of the education law, as added by chapter eight hundred twenty of the laws of nineteen hundred forty-seven, is hereby amended by adding thereto a new section, to be section three thousand twenty-two, to follow section three thousand twenty-one of such article, to read as follows:

'' § 3022. *Elimination of subversive persons from the public school system.* 1. The board of regents shall adopt, promulgate, and enforce rules and regulations for the disqualification or removal of superintendents of schools, teachers or employees in the public schools in any city or school district of the state who violate the provisions of section three thousand twenty-one of this article or who are ineligible for appointment to or retention in any office or position in such public schools on any of the grounds set forth in section twelve-a of the civil service law and shall provide therein appropriate methods and procedure for the enforcement of such sections of this article and the civil service law.

'' 2. The board of regents shall, after inquiry, and after such notice and hearing as may be appropriate, make a listing of organizations which it finds to be subversive in that they advocate, advise, teach or embrace the doctrine that the government of the United States or of any state or of any political subdivision thereof shall be overthrown or overturned by force, violence or any unlawful means, or that they advocate, advise, teach or embrace the duty, necessity or propriety of adopting any such doctrine, as set forth in section twelve-a of the civil service law. Such listings may be amended and revised from time to time. The board, in making such inquiry, may utilize any similar listings or designations promulgated by any federal agency or authority authorized by federal law, regulation or executive order, and for the purposes of such inquiry, the board may request and receive from such federal agencies or authorities any supporting material or evidence that may be made available to it. The board of regents shall provide in the rules and regulations required by subdivision one hereof that membership in any such organization included in such listing made by it shall constitute prima facie evidence of disqualification for appointment to or retention in any office or position in the public schools of the state.

" 3. The board of regents shall annually, on or before the fifteenth day of February, by separate report, render to the legislature, a full statement of measures taken by it for the enforcement of such provisions of law and to require compliance therewith. Such reports shall contain a description of surveys made by the board of regents, from time to time, as may be appropriate, to ascertain the extent to which such provisions of law have been enforced in the city and school districts of the state.''

The Feinberg Law is now challenged, as regards its constitutionality, in two cases pending before this court. For convenience, they will be referred to as Case No. 1 and Case No. 2, respectively.

Case No. 1 is an action brought by Robert Thompson, as chairman, and William Norman, as secretary, of the Communist party of the State of New York for a declaratory judgment that the Feinberg Law is unconstitutional. The defendants in the action are William J. Wallin and others comprising the Board of Regents of the State of New York. The action also seeks an injunction restraining the Board of Regents from enforcing any provision of the Feinberg Law and especially from preparing and publishing a list of subversive organizations thereunder. The plaintiffs have moved, in such action, for a temporary injunction, and a cross motion has been made by the defendants for judgment on the pleadings declaring the statute to be in all respects constitutional and valid, and dismissing the complaint upon the merits.

Case No. 2 is a proceeding brought pursuant to article 78 of the Civil Practice Act. The petitioners therein, with the exception of Johanna M. Lindlof, are employees of the New York City school system, said Johanna Lindlof having retired from such employment and now being a member of the pension system thereof. Their petition seeks relief similar to that of the plaintiffs in Case No. 1, namely, for an order directing the Board of Regents and others to desist from taking any action pursuant to the Feinberg Law and to treat the same as a nullity, upon the ground that it is unconstitutional.

While procedurally diverse, the two cases raise but a single substantive issue, namely, the constitutionality of the Feinberg Law. With laudable directness, and a desire that the basic issue be adjudicated, the parties have refrained from dilatory tactics. Public interest and the welfare of our educational system require a decision as to the validity of the Feinberg Law. The court launches its inquiry in that spirit and, with the co-operation of the litigants, has hurdled various procedural blocks which might otherwise impede or delay a decision upon the merits.

While attack has been directed solely at the latest enactment, it is apparent that the Feinberg Law, in large measure, is an implementation of the earlier statutes. Section 3 directs the Board of Regents to take steps to disqualify and remove teachers who violate the provisions of the earlier statutes. Even the subdivision which directs the listing of subversive organizations, which has been described as the only substantive addition made by the Feinberg Law, is no more than an additional legislative procedure in an effort to render more complete the enforcement of the antecedent statutes. It is inevitable, therefore, that section 3021 of the Education Law and section 12-a of the Civil Service Law must be given consideration in passing upon the validity of the 1949 enactment. In such consideration, little weight can be given to the circumstance, emphasized by counsel, that the one has not been challenged for the twenty-two years, and the other for the ten years, of its existence. Old or new, no statute is immune when challenged as transgressing constitutional limitations.

The attack upon this legislation is a broad one, and many constitutional provisions, Federal and State, are cited against it. Among these are the following:

The Ninth and Tenth Amendments to the United States Constitution relative to powers reserved to the people.

Article I of the New York Constitution and the First Amendment to the United States Constitution relative to freedom of speech, press and assembly and the right to petition for a redress of grievances.

Article I of the New York Constitution and the Fourteenth Amendment to the United States Constitution relative to deprivation of liberty and property without due process of law.

The provisions of the foregoing article and amendment relative to the equal protection of the laws.

Section 6 of article V of the New York Constitution relative to standards of public employment and subjective tests of merit and fitness therefor.

Section 1 of article XIII of the New York Constitution relative to oaths of office.

Section 10 of article I of the United States Constitution relative to bills of attainder, ex post facto laws, and laws impairing the obligation of contracts.

In support of the statute, the Attorney-General of the State of New York and *amicus curiæ* supporting his position assert that employment in the public schools is a privilege, not a right guaranteed by the Constitution; that the State has the right to

select its personnel; and that, in doing so, it may determine qualifications and fix standards. The court is referred to the oft-quoted words of Mr. Justice Holmes, while on the Supreme Judicial Court of Massachusetts, in *McAuliffe* v. *Mayor* (155 Mass. 216, 218): '' The petitioner may have a constitutional right to talk politics, but he has no constitutional right to be a policeman.''

Words must, of course, be read in their context, and the quotation cannot be extended beyond the facts in the *McAuliffe* case (*supra*). To do otherwise would do violence to the long struggle for the preservation of constitutional liberties with which the name of Mr. Justice Holmes was so long and so closely linked. The issue is not whether there is a constitutional right to teach, but whether the ground asserted for denying this right or privilege, whatever it is, is one which is protected by the Constitution against legislative encroachment. It is presumed that no one would contend that the State could validly provide, as a condition of public employment, that the applicant refrain from worship except in a stated church. Such law would be invalid not because of any constitutional right to public employment but because the Constitution protects freedom of religion and does not countenance its invasion either directly or by indirection. Many are the cases which illustrate this doctrine.

*United States* v. *Lovett* (328 U. S. 303 [1946]) involved the validity of an act of Congress whereby three named individuals, whose loyalty had been questioned by the House Committee on Un-American Activities, were forever barred from Government employment. The contention was there put forth, as here, that these men had no constitutionally protected right to their positions. It did not prevail. Such '' permanent proscription from any opportunity to serve the Government '', said the court, '' is punishment, and of a most severe type. It is a type of punishment which Congress has only invoked for special types of odious and dangerous crimes '' (p. 316). The legislative procedure was held to constitute a bill of attainder, and the proscription from Government employment nullified.

Answering another contention, which is now made in support of the Feinberg Law, that it penalizes no one and inflicts no punishment, the opinion of Mr. Justice Black points out that the statute under consideration, in cutting off Lovett's salary, is no less odious than if it characterized his conduct as criminal. It inflicts punishment and amounts to the same thing.

Writing for our own Court of Appeals, Judge Cardozo answered a similar contention in *People* v. *Crane* (214 N. Y.

154, 167–168 [1915]) " We do not, however, commit ourselves to the view that the power exists to make arbitrary distinctions between citizens. We do not hold that the government may create a privileged caste among the members of the state. * * * We do not hold that it may discriminate among its citizens on the ground of faith or color. * * * For like reasons we assume that he may not be disqualified because of faith or color from serving the state in public office or employment. *It is true that the individual, though a citizen, has no legal right in any particular instance to be selected as contractor by the government. It does not follow, however, that he may be declared disqualified from service, unless the proscription bears some relation to the advancement of the public welfare.*" (Italics supplied.)

This court concludes that the interest of the complaining parties herein, as regards their eligibility to hold a school position, is sufficient to give them standing to question validity of the Feinberg Law; and further that such eligibility enjoys constitutional status and protection of which one may not be deprived upon grounds or by procedures which violate our basic law.

This should not be construed, of course, as in any way affecting the undoubted power of the State and its creation, the Board of Regents, to set up qualifications for school personnel. Any test bearing reasonable relation to the fitness of an applicant or incumbent to teach our children may of course be applied and administered. Manifestly such qualifications include not only scholastic attainment and technical skill. The State may go further, and reasonably require that those whom it employs to guide its young be men and women of sound character, and imbued with a love of our traditions and democratic heritage. Such tests, properly applied, do not contravene the Constitution. (*United Public Workers of America* v. *Mitchell,* 330 U. S. 75 [1946]; *Matter of Summers,* 325 U. S. 561 [1945]; *Hawker* v. *New York,* 170 U. S. 189 [1898].)

The power to fix and determine the qualifications of its employees must, however, like other governmental powers, be exercised in a manner which does not transgress the limitations which the Constitution has placed upon all powers of Government. In exercising this prerogative, the Legislature may not pass a bill of attainder or ex post facto law; it may not abridge freedom of speech, press or assembly; it may not act without due process of law; it may not abridge the privileges and

immunities of citizens; nor may it deny to any citizen equal protection of the laws.

Whether any of these things has been done by the Feinberg Law is the basic issue in these cases.

### I. Is it a bill of Attainder?

Although decided in 1866, *Cummings* v. *Missouri* (4 Wall [U. S.] 277) is still the leading case upon this subject. A bill of attainder is therein described as " a legislative act which inflicts punishment without a judicial trial." If the punishment be less than death, it is termed a bill of pains and penalties, equally proscribed by the Constitution. " In these cases the legislative body, in addition to its legitimate functions, exercises the powers and office of judge; it assumes * * * judicial magistracy; it pronounces upon the guilt of the party, without any of the forms or safeguards of trial " (p. 323).

Such bills may be directed against individuals by name, or against a whole class.

The *Cummings* case (*supra,* p. 326) also defines ex post facto laws, with which a bill of attainder is closely associated. This is a law which imposes punishment for an act not punishable at the time it was committed. It includes acts which " impose additional punishment to that * * * prescribed " when the act was committed, or " change the rules of evidence by which less or different testimony is sufficient to convict than was then required."

The *Cummings* case (*supra*) and its companion, *Ex Parte Garland* (4 Wall [U. S.] 333) make it clear that perpetual exclusion from Government employment is punishment.

" Disqualification from office may be punishment, as in cases of conviction upon impeachment. Disqualification from the pursuits of a lawful avocation, or from positions of trust, or from the privilege of appearing in the courts, or acting as an executor * * * may also, and often has been, imposed as punishment." (*Cummings* v. *Missouri, supra,* p. 320. See, also, *United States* v. *Lovett,* 328 U. S. 303, 316, *supra.*)

With such decisions as a background, we turn to the Feinberg Law.

Section 1 twice refers to the Communist party by name. It refers to the " common report " that the Communist party has infiltrated into the schools, with the result that subversive propaganda can be disseminated among the children, with certain evil consequences. Then it declares it essential that

laws prohibiting persons who are members of subversive groups, " such as the communist party ", from employment in the schools be rigorously enforced. The Board of Regents is therefore admonished to take affirmative action to meet the menace.

While the statute refers to " statutes " on the books to cope with the situation, it is to be noted that no previous legislation singled out the Communist party by name or outlawed its activities. Section 3021 of the Education Law made reference to " treasonable or seditious " words or acts. Section 12-a of the Civil Service Law concerned itself with the doctrine of the overthrow of Government " by force, violence or any unlawful means."

Section 1 of the Feinberg Law must be read in its context, as a part of the whole, and in conjunction with subdivision 2 of section 3022 of the Education Law, as added by section 3 of the Feinberg Law, directing the regents to list subversive organizations. Thus read, the conclusion is inescapable that the Board of Regents is directed and required to list the Communist party as a subversive organization, with all the consequences thereto, and to its members, which the statute prescribes. Previously they had been commanded to enforce the 1917 statute against the Communist party, and to implement such command, the regents are told to list seditious organizations " such as the communist party ". In the absence of proof, it will not be presumed that membership in such party bears any logical relation to such members' fitness as teachers. Lacking such proof, and none is required by the statute, it follows that the disqualification must be considered as punishment.

The statute therefore violates the constitutional proscription of bills of attainder. It is a legislative finding of guilt of advocating the overthrow of Government by unlawful means without a judicial trial, and without any of the forms and guards provided for the security of the individual by our traditional judicial forms.

## II. Does it violate the " due process " clause?

It is now a well-established constitutional doctrine that the Bill of Rights amendments to the United States Constitution have been made applicable to the States by the Fourteenth Amendment. No more than Congress are State Legislatures permitted to interfere with the free exercise of religion, to abridge the freedom of speech or of the press, or the right of the people peaceably to assemble and to petition the Govern-

ment for redress of grievances. (*Saia* v. *New York,* 334 U. S. 558 [1948]; *Bridges* v. *California,* 314 U. S. 252 [1941]; *Cantwell* v. *Connecticut,* 310 U. S. 296 [1940]; *Thornhill* v. *Alabama,* 310 U. S. 88 [1940]; *Lovell* v. *Griffin,* 303 U. S. 444 [1938]; *Palko* v. *Connecticut,* 302 U. S. 319 [1937].) These basic civil rights have a " preferred position in our basic scheme ". (*Prince* v. *Massachusetts,* 321 U. S. 158, 164 [1944].)

They enjoy a greater degree of protection than the rights which stem solely from the Fourteenth Amendment. While a mere " rational connection " may suffice to satisfy the latter, a showing of clear and present danger is usually required to justify a restriction of the rights guaranteed by the Bill of Rights and extended to State action by the later amendment. (*West Virginia Bd. of Educ.* v. *Barnette,* 319 U. S. 624 [1943].)

Whether or not the court must find clear and present danger to exist within the doctrine of the *Schenck* case (*Schenck* v. *United States,* 249 U. S. 47) where the Legislature has made such finding does not appear to be free from doubt. (Cf. *Gitlow* v. *New York,* 268 U. S. 652, and *Whitney* v. *California,* 274 U. S. 357, with *Thomas* v. *Collins,* 323 U. S. 516, *West Virginia Bd. of Educ.* v. *Barnette, supra,* and *Herndon* v. *Lowry,* 301 U. S. 242.)

That power exists in the Government to proscribe and punish words which instigate and incite its overthrow by violence cannot be denied. (*Whitney* v. *California, supra; Gitlow* v. *New York, supra; Dunne* v. *United States,* 138 F. 2d 137 [1943], certiorari denied 320 U. S. 790, 814.)

Whether, in a specific instance, such power has been validly exercised remains, however, a judicial question, and one to be approached from a point of view which honors the long liberal traditions and philosophy which are the core of our democracy. Legislation abridging freedom of speech, of the press, or of assembly, do not come to judicial scrutiny with any presumption in their favor. (*West Virginia Bd. of Educ.* v. *Barnette, supra; Thomas* v. *Collins, supra.*)

That liberal tradition and philosophy have found eloquent expression in the opinions of the highest tribunal in the land. The dissents of an earlier day have not infrequently become accepted doctrine of later decisions.

The concurring opinion of Mr. Justice BRANDEIS, in *Whitney* v. *California* (*supra* pp. 375–377), in which he was joined by Mr. Justice HOLMES, bears repetition whenever times of stress provoke extraordinary measures to combat ideas deemed dangerous to our society.

" Those who won our independence believed that the final end of the State was to make men free to develop their faculties; and that in its government the deliberative forces should prevail over the arbitrary. They valued liberty both as an end and as a means. They believed liberty to be the secret of happiness and courage to be the secret of liberty. They believed that freedom to think as you will and to speak as you think are means indispensable to the discovery and spread of political truth; that without free speech and assembly discussion would be futile; that with them, discussion affords ordinarily adequate protection against the dissemination of noxious doctrine; that the greatest menace to freedom is an inert people; that public discussion is a political duty; and that this should be a fundamental principle of the American government. They recognize the risks to which all human institutions are subject. But they knew that order cannot be secured merely through fear of punishment for its infraction; that it is hazardous to discourage thought, hope and imagination; that fear breeds repression; that repression breeds hate; that hate menaces stable government; that the path of safety lies in the opportunity to discuss freely supposed grievances and proposed remedies; and that the fitting remedy for evil counsels is good ones. Believing in the power of reason as applied through public discussion, they eschewed silence coerced by law — the argument of force in its worst form. Recognizing the occasional tyrannies of governing majorities, they amended the Constitution so that free speech and assembly should be guaranteed.

" Fear of serious injury cannot alone justify suppression of free speech and assembly. Men feared witches and burnt women. It is the function of speech to free men from the bondage of irrational fears. * * *

" Those who won our independence by revolution were not cowards. They did not fear political change. They did not exalt order at the cost of liberty. To courageous, self-reliant men, with confidence in the power of free and fearless reasoning applied through the processes of popular government, no danger flowing from speech can be deemed clear and present, unless the incidence of the evil apprehended is so imminent that it may befall before there is opportunity for full discussion. If there be time to expose through discussion the falsehood and fallacies, to avert the evil by the processes of education, the remedy to be applied is more speech, not enforced silence. Only an emergency can justify repression. Such must be the rule if authority is to be reconciled with freedom. Such, in my

opinion, is the command of the Constitution. It is therefore always open to Americans to challenge a law abridging free speech and assembly by showing that there was no emergency justifying it.''

The philosophy expressed in this concurrence finds majority expression in later cases. Similar in purpose is the expression of Mr. Justice RUTLEDGE in *Thomas* v. *Collins* (*supra*, pp. 529–530): '' The case confronts us again with the duty our system places on this Court to say where the individual's freedom ends and the State's power begins. Choice on that border, now as always delicate, is perhaps more so where the usual presumption supporting legislation is balanced by the preferred place given in our scheme to the great, the indispensable democratic freedoms secured by the First Amendment. * * * That priority gives these liberties a sanctity and a sanction not permitting dubious intrusions. And it is the character of the right, not of the limitation, which determines what standard governs the choice. * * * It is therefore in our tradition to allow the widest room for discussion, the narrowest range for its restriction, particularly when this right is exercised in conjunction with peaceable assembly.''

And in *West Virginia Bd. of Educ.* v. *Barnette* (*supra*, pp. 641–642) the court again emphasized the overall importance of such basic rights:

'' The case is made difficult not because the principles of its decision are obscure but because the flag involved is our own. Nevertheless, we apply the limitations of the Constitution with no fear that freedom to be intellectually and spiritually diverse or even contrary will disintegrate the social organization. To believe that patriotism will not flourish if patriotic ceremonies are voluntary and spontaneous instead of a compulsory routine is to make an unflattering estimate of the appeal of our institutions to free minds. We can have intellectual individualism and the rich cultural diversities that we owe to exceptional minds only at the price of occasional eccentricity and abnormal attitudes. When they are so harmless to others or to the State as those we deal with here, the price is not too great. But freedom to differ is not limited to things that do not matter much. That would be a mere shadow of freedom. The test of its substance is the right to differ as to things that touch the heart of the existing order.

'' If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of

opinion or force citizens to confess by word or act their faith therein. If there are any circumstances which permit an exception, they do not now occur to us.''

Legislation which penalizes the free expression of views or espousal of doctrines must receive, therefore, the closest judicial scrutiny. Such is the nature of the Feinberg Law, and in such manner must it be considered.

A. *Vagueness*. A statute which penalizes an activity must be definite and certain in its application. It must fix a '' reasonably ascertainable standard of guilt ''. (*Herndon* v. *Lowry,* 301 U. S. 242, *supra*.) It '' must afford some comprehensible guide, rule, or information as to what must be done and what must be avoided, to the end that the ordinary member of society may know how to comply with its requirements.'' (*People* v. *Grogan,* 260 N. Y. 138, 145.) To inflict a penalty in the absence of such definite standard is a denial of due process. (*United States* v. *Cohen Grocery Co.,* 255 U. S. 81, 92; *Winters* v. *New York,* 333 U. S. 507.)

There is nothing indefinite or vague about the doctrine of overthrow of the Government by force, violence, or other unlawful means. The use of such standard has been judicially sanctioned, and the words have acquired a clear meaning. (*Whitney* v. *California,* 274 U. S. 357, *supra*; *Gitlow* v. *New York,* 268 U. S. 652, *supra*; *Dunne* v. *United States,* 138 F. 2d 137, *supra*.)

As heretofore pointed out, however, the Feinberg Law incorporates within itself, and directs the Board of Regents to implement certain antecedent statutes. One of these is section 3021 of the Education Law, which penalizes by disqualification any school employee '' for the utterance of any treasonable or seditious word or words or the doing of any treasonable or seditious act or acts ''. It is this provision, among others, which the Board of Regents is directed to enforce, and it is for this, among others, that a listing of '' subversive '' organizations is required.

In the opinion of the court, this statute fails entirely in establishing a definite standard of proscribed conduct. It is a '' dragnet which may enmesh anyone who agitates for a change of government ''. (*Herndon* v. *Lowry, supra*, p. 263.) Obviously these words are employed in no technical sense. In such sense, treason can be committed only against the United States. The Constitution is very explicit upon this point (U. S. Const., art. III, § 3) and specifies that treason can consist only in levying war against the United States, or in adhering to their enemies. No conviction may be had unless on the testi-

mony of two witnesses to the same overt act or on confession in open court. If common usage is intended, the words "treasonable" and "seditious", are not different from "subversive". Aside from a general impression they impart that the speaker's attitude is hostile and disapproving, they connote little that is definite or precise. They mean different things to different people. What was said by Mr. Justice JACKSON, when Attorney General, concerning the word "subversive" has equal application here: "Activities which seem helpful or benevolent to wage earners, persons on relief, or those who are disadvantaged in the struggle for existence may be regarded as 'subversive' by those whose property interests might be affected thereby. Those who are in office are apt to regard as 'subversive' the activities of any of those who would bring about a change of administration. Some of our soundest constitutional doctrines were once punished as 'subversive'".

Of this statute it may be said as it was in another connection in *Musser* v. *Utah* (333 U. S. 95, 97): "This led to the inquiry as to whether the statute attempts to cover so much that it effectively covers nothing. Statutes defining crimes may fail of their purpose if they do not establish some reasonable standards of guilt. * * * Legislation may run afoul of the Due Process Clause because it fails to give adequate guidance to those who would be law-abiding, to advise defendants of the nature of the offense with which they are charged, or to guide courts in trying those who are accused."

The force of these words is not avoided by pointing out that the Feinberg Law is not penal in its terms. The forfeiture which it involves is punishment of serious nature, and constitutional safeguards must play their part. (*Cummings* v. *Missouri*, 4 Wall. [U. S.] 277, *supra*.)

B. *Procedural Due Process*. The Feinberg Law sets up a new administrative technique whereby the rights of school personnel are to be determined. This procedure has been attacked, and the court must scrutinize it to determine whether it meets the requirements of due process.

Such requirements were recently reiterated by the Supreme Court of the United States in *Morgan* v. *United States* (304 U. S. 1 [1937]):

"The vast expansion in this field of administrative regulation in response to the pressure of social needs is made possible under our system by adherence to the basic principles that the legislature shall appropriately determine the standards of administrative action and that in administrative proceedings

of a quasi-judicial character the liberty and property of the citizen shall be protected by the rudimentary requirements of fair play. These demand '' a fair and open hearing,' — essential alike to the legal validity of the administrative regulation and to the maintenance of public confidence in the value and soundness of this important governmental process. Such a hearing has been described as an ' inexorable safeguard.' (pp. 14–15.)

'' The right to a hearing embraces not only the right to present evidence but also a reasonable opportunity to know the claims of the opposing party and to meet them. The right to submit argument implies that opportunity; otherwise the right may be a barren one. (P. 18.)

'' Congress in requiring a ' full hearing ' had regard to judicial standards, — not in any technical sense but with respect to those fundamental requirements of fairness which are of the essence of due process in a proceeding of a judicial nature.'' (P. 19.)

Our own Court of Appeals had occasion to apply some of these rules in connection with the State Recovery Act, in *Darweger* v. *Staats* (267 N. Y. 290). A statute which gave a Federal code of fair business practice the force of law upon mere filing in this State was held to be invalid. It fixed no standards, provided for no hearing and was otherwise unsound administrative procedure. These defects were fatal to the legislation.

The Feinberg Law suffers from the same defect. In listing an organization as subversive, the Board of Regents is required to hold no hearing save such '' as may be appropriate ''. Its discretion in that regard is untrammelled.

More serious is the effect of such listing, however determined, upon the individual applicant for, or incumbent of, a school position. He is given no notice of such hearing as may be had of the nature of his organization. He is afforded no opportunity to be present, to confront witnesses, to cross-examine, to adduce evidence of his own, or to argue to the Board of Regents the merits of his organization. Nevertheless, as applied to him, such determination is given weight, not only as evidence, but as prima facie evidence of disqualification. The burden is then upon him to clear himself as best he can. Legally, of course, the determination of the Board of Regents, as to him is conclusory and hearsay in an ultimate degree.

The Feinberg Law fails to meet the minimum standards of fairness required of an administrative proceeding. It offers no basis for depriving any man of the basic rights and privileges

of citizenship unless mere association can constitute lawful cause therefor.

Whether the statute could validly impose its penalties upon proof, in each instance, of membership in an organization advocating the overthrow of Government by violence need not be now decided. (See *Dunne* v. *United States, supra.*) Suffice it to say the Feinberg Law contemplates no such proof. Proof of membership in an organization, not proven as to any particular teacher to embrace such doctrine, in itself is sufficient basis for visiting harsh consequences upon him.

The procedure thus envisaged contravenes constitutional traditions of fair play, and amounts to a denial of due process.

C. *Presumption of Guilt.* The Feinberg Law, by its terms, directs the Board of Regents to promulgate a rule to the effect that membership in any organization included in its listing as subversive shall constitute prima facie evidence of disqualification. Thereby is created a presumption of guilt, in direct contradiction to our time-honored doctrine that each man is deemed to be innocent until the contrary is proved beyond a reasonable doubt.

If such presumption can ever be effective, it must be based upon some rational connection between the fact proved and the fact inferred, so as to provide reasonable basis for the inference. A presumption that is not so based is arbitrary, and violates the due process clause. (*Manley* v. *Georgia,* 279 U. S. 1 [1929]; *McFarland* v. *American Sugar Co.,* 241 U. S. 79 [1916]; *People* v. *Mancuso,* 255 N. Y. 463 [1931].)

Upon a hearing as to the disqualification of any individual school employee under the Feinberg Law, the fact proven would be merely membership in " X " organization, said organization being upon the regents' list of subversive organizations. As to such individual, upon such hearing, no proof of the doctrines and program of the organization need be offered. From the mere fact of membership and listing, the entire concept of advocacy of the overthrow of Government by violence must be inferred. Upon what " logical connection " is such presumption based? What is the fact proven in the proceeding, upon which the fact inferred may be based? Nothing is proven, and constitutionally nothing can be inferred. If the insolvency of a bank cannot validly raise a presumption of fraud on the part of its directors (*Manley* v. *Georgia, supra*) there is no greater support for the inference created by the statute now in question.

D. *Guilt by Association.* From what has been said, it follows that the only factual basis for disqualification under the statute

is the fact of membership in an organization. As to the individual no proof of illegal purpose or action is required. Nor need an unlawful purpose or act of his organization be proven as against him. Membership alone is sufficient. This is "guilt by association" with a vengeance. As regards such doctrine, one need read but a few excerpts from decisions of the Supreme Court of the United States.

"Individuals, like nations, may cooperate in a common cause over a period of months or years though their ultimate aims do not coincide. Alliances for limited objectives are well known. Certainly those who joined forces with Russia to defeat the Nazis may not be said to have made an alliance to spread the cause of communism."

"The doctrine of personal guilt is one of the most fundamental principles of our jurisprudence. It partakes of the very essence of the concept of freedom and due process of law. * * * It prevents the persecution of the innocent for the beliefs and actions of others." (*Bridges* v. *Wixon,* 326 U. S. 135, 143, 163 [1945].)

"At this point it is appropriate to mention * * * that under our traditions beliefs are personal and not a matter of mere association, and that men in adhering to a political party or other organization notoriously do not subscribe unqualifiedly to all of its platforms or asserted principles." (*Schneiderman* v. *United States,* 320 U. S. 118, 136 [1943].)

"The question, if the rights of free speech and peaceable assembly are to be preserved, is not as to the auspices under which the meeting is held but as to its purpose; not as to the relations of the speakers, but whether their utterances transcend the bounds of the freedom of speech which the Constitution protects. If the persons assembling have committed crimes elsewhere, if they have formed or are engaged in a conspiracy against the public peace and order, they may be prosecuted for their conspiracy or other violation of valid laws. But it is a different matter when the State, instead of prosecuting them for such offenses, seizes upon mere participation in a peaceable assembly and a lawful public discussion as the basis for a criminal charge.

"We are not called upon to review the findings of the state court as to the objectives of the Communist Party. Notwithstanding those objectives, the defendant still enjoyed his personal right of free speech and to take part in a peaceable assembly, having a lawful purpose, although called by that Party."

(*DeJonge* v. *Oregon,* 299 U. S. 353, 365–366 [1937]. See, also, *Herndon* v. *Lowry,* 301 U. S. 242 [1936], *supra.*)

*Conclusion*: The Feinberg Law has been attacked upon grounds other than here passed upon, but no useful purpose would be served by further analysis. It suffices to state the conclusion of the court that upon all the grounds which have been considered the legislation has been found to contravene the provisions of the Constitutions of the United States and of the State of New York.

In reaching such conclusion, the court is not, of course, oblivious to the practices of international communism, which have met with such universal and well-merited contempt among free men. It is not because they disapprove the evil thinkers and evildoers of their day less, but because they cherished their democracy more, that the great makers and interpreters of our Constitution have so jealously guarded the basic concepts of freedom.

It is no answer to say that this measure is needed to combat the menace of communism. Small service, indeed, to our democracy, is afforded by emulating the tactics of communism, and by destroying the guarantees of freedom.

Other, more effective means are envisaged by our free institutions, methods of combating excesses without destroying essentials. They find expression in the latest of a long series of memorable defenses of civil rights in our highest tribunal:

" Accordingly a function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea. That is why freedom of speech, though not absolute, * * * is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest. * * * There is no room under our Constitution for a more restrictive view. For the alternative would lead to standardization of ideas either by legislatures, courts, or dominant political or community groups." (DOUGLAS, J., in *Terminiello* v. *Chicago,* 337 U. S. 1, 4–5 [1949].)

The court finds it hard to believe that it is necessary to resort to witch-hunting in our schools to displace misfits. Necessary or not, the Feinberg Law cannot be the solution, because it is an

answer which the Legislature, under the Constitution, is powerless to provide.

In view of the decision herein made, various procedural objections made by the parties have become academic, and are not passed upon.

Judgment upon the pleadings is granted to the plaintiffs in Case No. 1. The petitioners in Case No. 2 are entitled to the relief requested in their petition.

Submit judgment and order accordingly.